**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**GLORIA BLACK-MEADOWS,**

*Plaintiff,*

v.

**DEPTFORD TOWNSHIP, *et al.*,**

*Defendants.*

No. 20-cv-06951

**OPINION**

**APPEARANCES:**

**Stanley O. King**
**Stephen Patrick Burke, Jr.**
JAVERBAUM, WURGRAFT, HICKS,
KAHN, WIKSTROM & SINNIS, P.C.
231 S. Broad Street
Woodbury, NJ 08046

**Lauren Goodfellow**
**Michael A. Galpern**
JAVERBAUM, WURGRAFT, HICKS,
KAHN, WIKSTROM & SINNIS, P.C.
1000 Haddonfield-Berlin Road, Suite 203
Voorhees, NJ 08043

*On behalf of Plaintiff*

**Todd J. Gelfand**
BARKER, GELFAND & JAMES
210 New Road, Suite 12
Linwood, NJ 08221

*On behalf of Defendants*

**O'HEARN, District Judge.**

## INTRODUCTION

This matter comes before the Court upon the motion for summary judgment ("Motion") filed by Defendants Deptford Township ("Township"), William Hanstein ("Hanstein"), Kevin Clements ("Clements"; together with the Township and Hanstein, "Defendants"), and William Bittner ("Bittner").[1] (ECF No. 133). Prior to this case being reassigned on September 7, 2025, the Honorable Joseph H. Rodriguez, Ret. heard oral argument on the Motion on February 28, 2024. (ECF No. 145). The undersigned afforded the parties the opportunity to submit supplemental briefs but did not hear further argument pursuant to Local Rule 78.1. For the reasons set forth below, Defendants' Motion, (ECF No. 133), is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

This case arises from the fatal shooting of LaShanda Anderson ("Anderson") by then-Deptford Township Police Sergeant Clements in Deptford, New Jersey on June 9, 2018. Plaintiff asserts claims based primarily on the events that occurred that day, but also related to Deptford Township Police Department's ("DPD") investigation and tracking of excessive force incidents as well as its internal policies and practices related to officer training. The Court will first recite the facts relevant to the June 9, 2018 shooting before addressing those relevant to DPD's investigatory and training practices.

### A. The Shooting

On the afternoon of June 9, 2018, Anderson and Chanel Barnes ("Barnes") drove a rented Nissan Armada ("Nissan") to the Marshalls Department Store ("Marshalls") in Deptford. (Defs.'

[1] All claims against Bittner have been dismissed. (ECF No. 119). As the Court refers to Defendants in this Opinion, it therefore does not include Bittner.

Statement of Material Facts ("SOMF"), ECF No. 133-13 at ¶¶ 2, 7–8).[2] The pair were eventually joined by a third person, Raoul Gadson ("Gadson"). (*Id.* ¶ 52). It is undisputed that Anderson and Barnes entered the store and proceeded to fill suitcases with more than $3,400 in merchandise they intended to steal. (*Id.* ¶¶ 53–55, 134). Upon observing the theft, Marshalls' loss-prevention officer Joseph Addes ("Addes") alerted a DPD dispatcher of the theft and requested police assistance. (*Id.* ¶ 56). Addes also reported to the dispatcher that some or all of the suspects were fighting with store security and that one of the suspects, Anderson, was wanted for homicide in Philadelphia. (*Id.* ¶¶ 50, 56–58). The parties agree, however, that Anderson was not then-wanted for homicide, and that the police dispatch was incorrect in that regard. (*Id.* ¶ 135). Nearby officers Clements and Bittner eventually received the dispatch and proceeded to the scene. (*Id.* ¶¶ 57–58).

After Anderson and Barnes exited the Marshalls, Addes and fellow loss-prevention officer Adrian Brown ("Brown") approached them. (*Id.* ¶¶ 53, 60). Brown first approached Anderson, and it is disputed whether they engaged in a physical altercation. (*Id.* ¶ 61). Specifically, Plaintiff contends that only Gadson physically assaulted Brown. (*Id.* ¶¶ 62–63).

---

[2] The Court notes three issues with the parties' submissions to clarify the record. First, Plaintiff argues that Defendants' SOMF fails to cite record evidence, in violation of Federal Rule of Civil Procedure 56. (*See* Pl.'s Responsive Statement of Material Facts ("RSOMF"), ECF No. 138-1 at 2). Although Defendants' SOMF is not a model of clarity, it does appear to include record citations for most, but not all, of its factual assertions. (*See, e.g.*, Defs.' SOMF, ECF No. 133-13 at ¶ 11 (citing "SOF10, page 16 lines 6 to 11")). While those citations are neither typical nor proper in form, the Court can discern that Defendants are citing to the exhibits submitted in support of their Motion. (*See* ECF Nos. 133-14 through 133-24). Second, although Plaintiff responded to Defendants' SOMF, (*see* RSOMF, ECF No. 138-1), Plaintiff did not submit a separate counter SOMF. Accordingly, any citation to Defendants' SOMF incorporates Plaintiff's admissions, denials, and qualifications in her RSOMF. (*See* ECF No. 138-1). Finally, Plaintiff did not electronically file the exhibits cited in support of her opposition brief, instead providing them in hard copy to Chambers. The Court therefore cites either the page of Plaintiff's Brief, (ECF No. 138), on which the exhibit is referenced or the exhibit itself, without a docket number. All such exhibits are on file with Chambers.

After hearing police sirens, Gadson fled into the woods nearby, and Anderson and Barnes ditched the stolen merchandise and ran towards the parking lot. (*Id.* ¶¶ 64–66). Shortly thereafter, Clements and Bittner arrived at the parking lot in their police vehicles. (*See id.* ¶ 59). Neither officer was equipped with a body camera, (*see id.* ¶ 3), and the parties' versions of events as to what occurred in the parking lot diverge sharply.

Bittner testified that, upon his arrival, he observed a group of people fighting. (*Id.* ¶ 67). Clements testified that he observed Barnes punching and kicking Marshalls' security personnel. (*Id.* ¶ 80). Plaintiff disputes that Anderson or Barnes were involved in that fight. (*Id.* ¶¶ 68, 80). Anderson ultimately fled upon seeing Bittner, made her way to the Nissan, and put the car in drive. (*Id.* ¶¶ 68–69). Meanwhile, Barnes refused to obey Clements' order to stop and be placed under arrest, and then similarly fled towards the Nissan. (*See id.* ¶¶ 81–83).

Bittner pursued Anderson, drew his service weapon, commanded Anderson to stop the Nissan, and made his way to the driver's side door. (*Id.* ¶¶ 69–71). Once he was standing at the driver's side door, the Nissan lurched forward, causing the door to hit Bittner in the shoulder. (*Id.* ¶ 69). Bittner estimated that, upon being hit with the door, the car moved forward another fifty feet, all while he continued to command Anderson to stop. (*Id.* ¶¶ 70–71). Anderson eventually stopped the vehicle to let Barnes into the front passenger's seat. (*Id.* ¶ 72).

During the ensuing critical moments, Bittner and Clements were unaware of the other's whereabouts. (*Id.* ¶¶ 74, 84). While the Nissan was stopped, Bittner threw his baton at the back windshield so that the vehicle would be "marked" if it got away. (*Id.* ¶ 73). Once Barnes eventually got in the Nissan, Clements ran around to the front of the vehicle, drew his weapon, and ordered Anderson to halt. (*Id.* ¶ 86). Anderson did not respond to Clements' command. (*Id.* ¶ 90). Instead, Anderson accelerated the Nissan. (*See id.* ¶ 91). Clements then fired three shots in rapid succession.

(*Id.* ¶ 95; *see* Defs.' Ex. 7, ECF No. 133-21 at 14 ("It is reasonable for a trained police officer to be capable of delivering all three shots in one second.")). The first shot went through the windshield and struck Anderson in her right arm. (Defs.' SOMF, ECF No. 133-13 at ¶ 27; Defs.' Ex. 7, ECF No. 133-21 at 18). The second shot struck the Nissan's hood and lodged in the vehicle's lower left windshield area. (Defs.' SOMF, ECF No. 133-13 at ¶ 32; Defs.' Ex. 7, ECF No. 133-21 at 16, 20). The third, and fatal, shot entered the driver's side window and struck Anderson in the head through her left ear. (Defs.' Ex. 7, ECF No. 133-21 at 2, 18, 20). After the shots were fired, the Nissan veered right, continued forward, crossed a mulch bed, and came to rest near a tree in the parking lot. (Defs.' SOMF, ECF No. 133-13 at ¶ 106). Anderson died at the scene. (Defs.' Ex. 7, ECF No. 133-21 at 2).

In addition to the factual disputes noted above, there are, broadly speaking, two material disputes as to what occurred during those few fateful moments after Clements positioned himself near the front of the Nissan. Both disputes concern the degree of the threat, if any, that Anderson posed while driving.

First, the parties dispute both the significance of Clements' movement from the side of the Nissan to a position more directly in its path and his precise location once in front of the vehicle. It is undisputed factually that Clements moved from somewhere alongside the Nissan to a position somewhere in front of it, where he claims he remained stationary while firing all three shots. (Defs.' SOMF, ECF No. 133-13 at ¶¶ 86, 93). According to Defendants, Clements stood "approximately 12 to 15 feet in front" of the vehicle, "almost dead center . . . where a hood ornament would normally go." (*Id.* ¶ 87). Plaintiff disputes this, but points to testimony regarding bullet trajectory evidence placing Clements in roughly the same position; that is, "slightly off center towards the passenger side." (*Id.*; *see* Pl.'s Ex. G at 42:5–43:5). Under either account, however, Clements was

positioned somewhere in front of the Nissan when Anderson accelerated and the shots were fired. Thus, the parties' dispute is less about the relatively slight difference between their accounts of precisely where Clements stood when firing than about the significance of his decision to move in front of the Nissan in the first place.

Second, given that Clements was stationary when he fired all three shots, the principal factual dispute concerns the direction the Nissan was traveling immediately before Clements fired and thus the actual threat Anderson posed to Clements. Defendants, relying principally on Clements' testimony, contend that Anderson accelerated "directly at" him. (Defs.' SOMF, ECF No. 133-13 at ¶ 91). Clements further recalled that "as he fired the second and third round[s]," the vehicle jerked or veered to the right. (*Id.* ¶ 97; Defs.' Ex. 3, ECF No. 133-17 at 35)). Plaintiff maintains instead that Anderson was steering the Nissan to the right and away from Clements at the time the first shot was fired. (Defs.' SOMF, ECF No. 133-13 at ¶ 97). That account rests largely on expert and forensic evidence concerning the trajectories of the three shots. Because Clements testified that he remained stationary while firing, Plaintiff reasons that the first shot's entry through the windshield, followed by the fatal shot's entry through the driver-side window, indicates that the Nissan was always turning rightward and away from Clements as he fired. (*Id.*). Consistent with that theory, Plaintiff also provides an expert accident reconstruction, which depicts the Nissan already angled somewhat rightward out of a parking space moments before Clements fired. (Pl.'s Ex. F at 13–18). Defendants rely on Plaintiff's accident reconstruction to craft their own narrative of the shooting. (*See* Defs.' SOMF, ECF No. 133-13 at ¶¶ 22–23).

**B. Excessive Force Investigations and the Guardian System**

Plaintiff also asserts claims based on DPD's investigation and tracking of excessive force complaints against its officers.[3]

DPD procedures require every allegation of excessive force to be referred to the Gloucester County Prosecutor's Office ("GCPO") for review. (Pl.'s Br., ECF No. 138 at 36–37 (citing Pl.'s Ex. O at 38:5–39:16; 75:2–14); *see also* Pl.'s Ex. M (DPD use of force policy)). If the GCPO declines to bring charges, DPD Internal Affairs must then conduct a separate review, which includes obtaining relevant records and interviewing the complainant and witnesses. (Pl.'s Br., ECF No. 138 at 36–37 (citing Pl.'s Ex. O at 38:5–39:16; 75:2–14).

Here, according to Plaintiff, DPD Internal Affairs did not interview Bittner because GCPO "handled everything"; Clements suffered no employment consequences because GCPO "reviewed it and said it was good"; and neither Clements nor Bittner completed a Use of Force Report, despite DPD policy requiring one, because GCPO allegedly advised that their statements would suffice. (Pl.'s Br., ECF No. 138 at 36 (citing Pl.'s Ex. B at 136:18–25, 156:21–157:3; Pl.'s Ex. E at 190:22–192:3)). Defendants only broadly dispute that account, and contend that Plaintiff has not identified any Internal Affairs investigation that was inadequately performed or any case that would have been sustained had a proper investigation been conducted. (*See* Defs.' SOMF, ECF No. 133-13 at ¶¶ 41–42). Plaintiff responds that her police-practices expert Roger Clark ("Clark") testified that Clements had a history of complaints, that the investigations into them were inadequate, and that had Clark been the supervising officer he would have required a more thorough investigation. (*Id.*).

[3] The Court's ability to evaluate these claims is complicated by Plaintiff's failure to submit a counter SOMF with her opposition brief, as well as by the fact that Plaintiff's RSOMF contains few, if any, facts particularly relevant to these claims. Even so, the Court has considered the exhibits cited or referred to in Plaintiff's brief in support of these claims.

Plaintiff also challenges DPD's tracking of complaints through its "Guardian" system. Under that system, an officer would be subject to specific review or intervention if they received three DPD Internal Affairs complaints within a twelve-month period. (Defs.' SOMF, ECF No. 133-13 at ¶ 35). Police-practices expert Clark opined that Clements had a history of complaints and that, "when the complaints regarding Sergeant Clements were entered into the Guardian System they were deliberately mislabeled as minor infractions and the actual facts indicative of actual serious misconduct and excessive use of force were omitted altogether." (Pl.'s Br., ECF No. 138 at 46–47 (citing Pl.'s Ex. K at 18, 24)). However, it is undisputed that there is no evidence of any twelve-month period before the Anderson shooting in which Clements received three or more complaints, even if they were purposefully or negligently mislabeled. (Defs.' SOMF, ECF No. 133-13 at ¶ 36).

The parties further dispute what the Guardian-related records show about DPD's handling of complaints against Clements. Defendants assert that every prior Internal Affairs complaint against Clements was investigated. (*Id.* ¶ 34). Plaintiff disputes that assertion to the extent it presumes all complaints were known and investigated, and asserts that it is unknown whether additional complaints existed but were not entered into the Guardian system and thus were not investigated. (*See id.* ¶ 34). But Plaintiff fails to point to any evidence that there were any other complaints that were not entered into the Guardian system. Further, it is undisputed that no Internal Affairs use-of-force complaint against Clements was sustained during his career, but Plaintiff notes that Clements testified he was investigated by Internal Affairs approximately twenty to twenty-five times, including seven excessive-force complaints. (*Id.* ¶ 39). Plaintiff further points to Clements' testimony that, despite that volume of investigations, no one at DPD spoke to him about the number of complaints, and that, in one prior excessive-force lawsuit in which Clements was

named as a defendant, he first learned the specific allegations against him during his deposition. (*Id.*; Pl.'s Br., ECF No. 138 at 44–45 (citing Pl.'s Ex. E at 195:20–197:6, 287:1–288:11)).

**C. Officer Training**

Plaintiff also asserts claims related to DPD's training and written policies concerning officer interactions with moving vehicles, including the use of so-called "human blockades" as well as foot pursuits more generally. Defendants assert that Plaintiff has identified no written training standard or guideline providing that, under the circumstances facing Clements, an officer should not tactically place himself in front of a motor vehicle. (Defs.' SOMF, ECF No. 133-13 at ¶ 29). Defendants further state that Plaintiff cannot identify any general policing standard that prohibits officers from firing at a moving vehicle in all circumstances, nor any New Jersey law-enforcement agency policy, guideline, or police-academy training that categorically prohibits an officer from shooting at a moving vehicle. (*Id.* ¶¶ 30–31).

Plaintiff does not dispute the absence of a categorical prohibition on firing at a moving vehicle. (*Id.*). Plaintiff contends, however, that DPD's own policies materially restricted such conduct. Specifically, Plaintiff points to DPD's Pursuit Policy, which provides that roadblocks "should only be employed as a last resort in circumstances where deadly force would otherwise be justified," and DPD's Use of Force Policy, which recognizes the risk of death or serious injury associated with discharging a firearm, provides that officers generally should not fire "at the driver or occupant of a moving vehicle." (*Id.* ¶¶ 29, 31). Plaintiff further notes that other officers testified that they are not trained to place themselves in front of a moving vehicle to stop it. (*Id.* ¶ 29). Thus, although the parties agree that DPD policy did not categorically forbid shooting at moving vehicles, they dispute whether its policies and training nevertheless prohibited or discouraged the specific tactical conduct Clements employed in this case.

## II. PROCEDURAL HISTORY

Gloria Black-Meadows ("Black-Meadows" or "Plaintiff") is Anderson's sister and administrator of Anderson's estate. (Am. Compl., ECF No. 29 ¶ 1). On June 7, 2020, Black-Meadows commenced this action together with Anderson's children. (Compl., ECF No. 1). Anderson's children have since dismissed their claims with prejudice, leaving Black-Meadows as the sole remaining Plaintiff. (Order, ECF No. 118).[4]

The Amended Complaint, (ECF No. 29), filed on December 7, 2020, asserts nine claims: (1) a claim under 42 U.S.C. § 1983 ("Section 1983") against Clements for excessive force under the Fourth Amendment; (2) a Section 1983 conspiracy claim against Clements and Bittner; (3) a Section 1983 claim against the Township and Hanstein; (4) a New Jersey Civil Rights Act ("NJCRA") claim against Clements, Bittner, Hanstein, and the Township; (5) a common law assault-and-battery claim against Clements, the Township, and Hanstein; and (6) negligence, (7) gross-negligence, (8) wrongful-death, and (9) survivorship claims, all against Clements, Bittner, Hanstein, the Township, and Marshalls. By stipulation, the parties dismissed all claims against Bittner and Marshalls. (ECF Nos. 35, 119).

Defendants filed the instant Motion on October 6, 2023. (ECF No. 133). Plaintiff opposed the Motion on November 13, 2023. (ECF No. 138). Following reassignment of this matter to the

[4] One of Anderson's children, Rakel Rogers, remains listed on the docket as an active plaintiff, but such designation is likely a clerical error. The Amended Complaint names Anderson's three children as Lakeima Savage, Razayia Rogers, and Rakel Rogers, (ECF No. 29 at ¶¶ 2–4), while the Court's prior Order dismissed "all claims" brought by Lakeima, Razayia, and "R.R., a minor," (ECF No. 118). The Court therefore presumes that "R.R." refers to Rakel Rogers and that Rakel has also been dismissed from this case.

undersigned, the Court afforded the parties the opportunity to submit supplemental briefing,[5] which they did in December of 2025. (ECF Nos. 155–59).

## III. LEGAL STANDARD

Courts may grant summary judgment when a case presents "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists only when there is sufficient evidence for a reasonable jury to find for the non-moving party. *Young v. United States*, 152 F. Supp. 3d 337, 345 (D.N.J. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 346 (quoting *Anderson*, 477 U.S. at 255).

The moving party bears the burden of establishing that no genuine issue of material fact exists. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 252). The non-moving party, however, must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).

## IV. ANALYSIS

Defendants move for summary judgment on all claims. For the reasons that follow, the Motion is denied as to Count I, granted as to Counts II and III, and, as to Counts IV through IX,

---

[5] Defendants also submitted a supplemental SOMF. (*See* ECF No. 156). That submission goes beyond the scope of the Court's permissive additional briefing and no leave to file any additional documents was sought. As such, this additional material was not considered by the Court in deciding the Motion.

denied as to Clements but granted to the extent those claims remain pending against any other Defendant.

**A. Section 1983 Claims (Counts I and II)**

Count I asserts a Section 1983 claim against Clements for violating Anderson's Fourth Amendment right to be free from unreasonable seizure. Count II asserts a conspiracy claim against Clements and Bittner based on the same alleged deprivation. (Am. Compl., ECF No. 29 at ¶¶ 14–33).

The Court first addresses the Count II conspiracy claim because it may be disposed of briefly. Perhaps unsurprisingly given Bittner's dismissal from this action, nowhere in her briefing does Plaintiff oppose Defendants' motion for summary judgment on this claim. Even so, neither Bittner's dismissal nor Plaintiff's failure to oppose the motion on this claim necessarily resolves the claim in Defendants' favor. *See Adami v. Cardo Windows, Inc.*, No. 12-2804, 2014 WL 2586933, at *15 (D.N.J. June 10, 2014) (noting that an alleged conspirator need not remain a named defendant for a plaintiff to proceed on a conspiracy theory); *Anchorage Assocs. v. V.I. Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990) ("If the adverse party does not . . . respond, summary judgment, if appropriate, shall be entered against the adverse party." (citation omitted)). But the claim nevertheless fails because Plaintiff has marshaled no evidence of the critical element of a conspiracy claim under Section 1983: "*an agreement* for the purpose of depriving constitutional rights under color of state law." *Stolinski v. Pennypacker*, 772 F. Supp. 2d 626, 646 (D.N.J. 2011) (emphasis added). Defendants are therefore entitled to summary judgment on Count II.

The underlying Section 1983 claim against Clements, however, survives summary judgment because there are disputed issues of fact as to the underlying alleged constitutional violation and Clements is not entitled to qualified immunity.

Section 1983 "provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). "Thus, police officers who, acting under color of state law, violate an individual's federal constitutional or statutory rights are subject to liability under § 1983." *Id.*

When confronted with a Section 1983 claim, officers ordinarily raise the doctrine of qualified immunity. Qualified immunity "is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted). Under this doctrine, officers performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Courts use a two-prong test to determine if an officer is entitled to qualified immunity. *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). On the first prong, the Court considers whether the facts, "[t]aken in the light most favorable to the party asserting the injury," show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). On the second, the Court asks, "whether the right was clearly established" such that it was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 201–02. Deciding which qualified immunity question to address first is within the Court's discretion, and a defendant is entitled to qualified immunity if the answer to either question is "no." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Reichle v. Howards*, 566 U.S. 658, 663 (2012).

1. Fourth Amendment Violation

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. To prove a claim for excessive force as an unreasonable seizure under the Fourth Amendment, "a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011).

Clements seeks summary judgment on the ground that his use of deadly force was objectively reasonable as a matter of law.[6] The objective reasonableness test must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (quotations omitted). This test is a highly fact-specific inquiry to be "judged from [the officer's] on-scene perspective," and not through the "20/20 vision of hindsight." *Saucier*, 533 U.S. at 205 (internal citations and quotations omitted). A "proper application" of the test considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Other factors to consider include the possibility that the suspect is violent, the duration of the action, and the possibility that the suspect may be armed." *Smith v. Addy*, 343 F. App'x 806, 808 (3d Cir. 2009) (citing *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199, 209–11 (3d Cir. 2007)).

---

[6] Obviously, Anderson was "seized" when she was shot at and eventually killed, as "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Thus, the only relevant consideration here is whether Clements' exercise of deadly force was objectively reasonable under the circumstances.

Here, the parties present materially different versions of nearly every consequential moment preceding Clements' use of deadly force. The Court could resolve those differences only by crediting certain evidence over other evidence and choosing between competing accounts of the encounter. But the summary judgment standard does not permit such fact finding. Accordingly, whether Clements' use of force was objectively reasonable must be resolved by a jury.

There are disputes as to the severity of the underlying offense and the threat Anderson posed to others. Defendants characterize the encounter as involving theft, violent flight, and a reported homicide warrant. (*See* Defs.' SOMF, ECF No. 133-13 at ¶¶ 56–58, 64–66, 134). Plaintiff responds that the police dispatch began as a mere shoplifting call; that any physical altercation with Marshalls' loss-prevention personnel involved another individual, not Anderson or Barnes; that the homicide-warrant information relayed to dispatch was mistaken;[7] and that no pedestrians, occupied vehicles, or bystanders were in the vicinity when Anderson entered the Nissan and attempted to flee. (*Id.* ¶¶ 53–58, 61–63, 91, 135). These disputes, both individually and collectively, bear directly on the objective reasonableness analysis and cannot be resolved by the Court on summary judgment.

The more critical disputes, however, are related to the threat Anderson posed to the officers involved. Specifically, the parties dispute both Clements' precise position relative to the Nissan when he fired and the significance of his decision to leave a position of relative safety alongside the vehicle and move in front of it, notwithstanding DPD policies discouraging officers from firing

[7] It is undisputed both that the dispatch reported that Anderson was wanted in connection with a homicide and that this information was untrue. (Defs.' SOMF, ECF No. 133-13 at ¶¶ 33, 135). But whether the dispatch was ultimately accurate is immaterial to the Fourth Amendment analysis. The relevant inquiry is what a reasonable officer encountered based on the information available to them at the time, not whether that information later proved incorrect. *See Graham*, 490 U.S. at 396–97. Thus, the Court considers the circumstances as they reasonably appeared to the officers on the scene—that they were confronting a suspect who was wanted on a homicide warrant.

at moving vehicles absent imminent danger and no reasonable alternative. (*See id.* ¶¶ 29, 31, 86). The former dispute is, as noted *supra*, a relatively narrow one over positional inches that does little to alter the objective reasonableness analysis on its own, though its resolution ultimately belongs to the jury. After all, it is undisputed that, once Clements was in front of the Nissan, he remained stationary in that position, and his relative position to the Nissan only changed because of the vehicle accelerating. But the latter dispute over the significance of Clements' movement in front of the Nissan raises a distinct legal question: whether an officer's antecedent conduct that may have contributed to the circumstances necessitating force and which was, at the very least, discouraged by then-existing police procedures may be considered as part of the Fourth Amendment's totality-of-the-circumstances inquiry.

The Court sees no reason why it should not be. It is true that the Supreme Court and the Third Circuit have stopped short of definitively resolving the role of antecedent police mishaps in the Fourth Amendment reasonableness inquiry. *See Cnty. of L.A. v. Mendez*, 581 U.S. 420, 429 n.* (2017) (declining to decide whether "unreasonable police conduct prior to the use of force that foreseeably created the need to use it" may be considered); *Barnes v. Felix*, 605 U.S. 73, 83 (2025) (citing *Mendez*, and similarly declining to address "whether or how an officer's own 'creation of a dangerous situation' factors into the reasonableness analysis"); *Johnson v. City of Philadelphia*, 837 F.3d 343, 351 (3d Cir. 2016) (declining to decide whether the "analysis should account for whether the officer's own reckless or deliberate conduct unreasonably created the need to use deadly force"). But the absence of a definitive answer to the question does not compel the Court, nor should it a jury, to confine its analysis to the split second in which Clements pulled the trigger. Objective reasonableness has always been a flexible and contextual inquiry. *See Graham*, 490 U.S. at 396. And the Third Circuit has cautioned against segmenting an encounter in a manner that

isolates the seizure from the events surrounding it. *See Abraham v. Raso*, 183 F.3d 279, 291–92, 295–96 (3d Cir. 1999). Thus, while antecedent officer conduct that is against internal policy or unlawful cannot independently establish excessive force, such conduct is not irrelevant to the totality-of-the-circumstances inquiry. And nothing in Fourth Amendment jurisprudence requires the Court to artificially sever a shooting from the immediately preceding events that define the circumstances confronting an officer. *See Barnes*, 605 U.S. at 80 (stating that "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones"). That understanding is consistent with the approach taken by other courts since *Mendez*, which have continued to consider antecedent police conduct insofar as it bears on the reasonableness and necessity of the ultimate use of force. *See, e.g.*, *Est. of Singletary v. City of Philadelphia*, No. 19-190, 2021 WL 5235232, at *10 (E.D. Pa. Nov. 10, 2021); *Pauly v. White*, 874 F.3d 1197, 1219 (10th Cir. 2017); *Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 114 (2d Cir. 2020), *abrogated on other grounds by Case v. Montana*, 607 U.S. 107 (2026); *Winkler v. City of Phoenix*, 849 F. App'x 664, 667 (9th Cir. 2021).

On the record here, Clements' movement from alongside the Nissan—a position Plaintiff describes as relatively safe—to a position in front of it, together with evidence concerning DPD's policies and available alternatives, may inform the jury's assessment of the nature and immediacy of the threat Clements reasonably perceived when he fired. To be sure, Defendants are correct that the Constitution does not convert every questionable tactical decision into excessive force or permit hindsight-based second-guessing; however, the significance of Clements' movement cannot be excluded from the reasonableness inquiry as a matter of law and instead must be left for the jury to assess as part of the entire sequence of events.

And here Clements' decision to move toward the front of the Nissan indeed provides important context for the central factual dispute concerning the degree of threat Clements faced, namely, over the vehicle's direction of travel immediately before and during the shooting. Defendants portray an oncoming vehicle that veered safely away from Clements only after he began firing. Plaintiff, by contrast, points to the path of the three bullets across the vehicle from left to right, as well as the accident reconstruction depicting the Nissan already turning rightward away from Clements before the shooting, to support the competing inference that Anderson was already turning away from Clements in an effort to flee and never posed a threat warranting the use of deadly force. (*Id.* ¶ 91; *see* Defs.' Ex. 7, ECF No. 133-21 at 2, 14, 18). The distinction is consequential because a vehicle accelerating directly toward an officer presents a materially different threat from one already moving out of his path. But drawing these inferences in Plaintiff's favor, as the Court must, a reasonable jury could find that Anderson was turning the Nissan away from Clements prior to the shooting, and thus, under these circumstances, each of the three shots that Clements fired at Anderson was not objectively reasonable.[8] *See Abraham*, 183 F.3d at 293–95 (reversing summary judgment where a jury could find, based in part on bullet-trajectory evidence, that the officer fired from the side of the vehicle after she was no longer in its path and thus no longer reasonably in peril); *Eberhardinger v. City of York*, 782 F. App'x 180, 184–86 (3d

[8] For this reason, Defendants' reliance on *Plumhoff v. Rickard*, 572 U.S. 765 (2014), to argue that the asserted reasonableness of the first shot necessarily renders the final two shots reasonable is misplaced. (*See* Defs.' Reply Br., ECF No. 141 at 11–13). *Plumhoff* held that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." 572 U.S. at 777. That rule presupposes both a justified initial use of deadly force and a continuing threat. Here, however, whether Clements' initial use of force was justified is itself disputed, because Plaintiff's reconstruction and trajectory evidence support the competing inference that the Nissan was already turning to pass Clements when he began firing. A jury must decide whether the evidence supports that inference or instead better supports Defendants' account that the Nissan was bearing down on Clements. *Plumhoff* therefore does not resolve the issue.

Cir. 2019) (affirming denial of summary judgment where a jury could find that the officer moved out of the vehicle's path before firing at a slow-moving vehicle as it passed him).

To be sure, the absence of body camera or other video footage depicting Anderson's on-foot flight and eventual shooting necessarily broadens the spectrum of possible factual disputes in this case. *See Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 192 (3d Cir. 2021) ("[W]here there is reliable video depicting the events in question, courts must not adopt a version of the facts that is 'blatantly contradicted' by the video footage." (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007))). But where, as here, there is no such video for the Court to review and plausible competing accounts can be reconstructed through, *inter alia*, witness testimony and expert reports, the Court cannot simply credit one party's version of events over the other. Resolving those divergent accounts is squarely within the province of a jury, and a reasonable one could find on this record that Clements' use of deadly force was not objectively reasonable under the Fourth Amendment.

2. Clearly Established Law

Having determined that a jury could find Clements' use of force was objectively unreasonable, it must next be decided whether the right at issue was clearly established. The Court answers that question in the affirmative.

The Third Circuit has articulated a two-part inquiry to determine whether a right was clearly established at the time of an alleged violation:

> First, we must define the right allegedly violated at the appropriate level of specificity. This requires us to frame the right in light of the specific context of the case, not as a broad general proposition. Second, we must ask whether that right was "clearly established" at the time of its alleged violation, *i.e.*, whether the right was sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is an objective (albeit fact-specific) question, where an officer's subjective beliefs . . . are irrelevant.

*Peroza-Benitez*, 994 F.3d at 165 (citations and quotations omitted). To determine whether a right was "sufficiently clear," the Court looks to binding, factually analogous precedent from either the

Supreme Court or the Third Circuit. *Id.* A "robust consensus of cases of persuasive authority in the Courts of Appeals" and other district courts can also inform the analysis when appropriate. *Id.* at 165–66 (quotations omitted). In any event, only precedent prior to June 9, 2018, the date of the shooting here, is properly considered. *See Bryan v. United States*, 913 F.3d 356, 362 (3d Cir. 2019).

As explained, a reasonable jury could credit Plaintiff's version of the facts, and therefore Plaintiff's framing of the right at issue for purposes of the "clearly established" inquiry: that Anderson was shot at three times after she committed a non-violent offense, fled non-violently on foot, and sought to flee in a vehicle that was always turning and driving past an officer. "Assuming (as [the Court] must) that this view of the evidence is the one that ultimately will prevail," *Lamont*, 637 F.3d at 185, Clements is not entitled to qualified immunity because the Third Circuit established in *Abraham v. Raso* that an officer may not use deadly force under such circumstances.

In *Abraham*, the Third Circuit denied an officer's bid for summary judgment on excessive force claims where a suspected shoplifter fled from a retail store, entered a vehicle in a parking lot, refused commands to stop fleeing, and ultimately attempted to evade apprehension by car. *See* 183 F.3d at 282–86. The officer claimed that she fired at the vehicle because the suspect drove toward her and placed her in immediate danger. *Id.* at 284–85. The plaintiff estate, however, relied on physical evidence showing that the fatal shot entered through the driver-side window rather than the windshield, which supported the inference that the officer was not directly in front of the vehicle when she fired and that the vehicle was moving past or away from her. *Id.* at 285–86, 293–94. The Third Circuit held that those facts precluded a determination that the shooting was objectively reasonable as a matter of law, noting generally that "[a] passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect." *See* 183 F.3d at 293–95.

The Court finds the facts of this case to fall well within *Abraham*'s reach. As in *Abraham*, Plaintiff's version of events would permit a jury to find that Clements fired at the Nissan after it had already begun turning away from him. Although *Abraham* involved only a single shot fired through the driver's-side window, and Defendant argues it is therefore materially different from this case, its underlying principle applies with equal force here: an officer may not use deadly force against a fleeing suspect when the vehicle poses no threat to the officer. Plaintiff has adduced evidence from which a reasonable jury could find not merely that the Nissan had ceased driving toward Clements, but that it was never headed directly at him and instead was always turning to pass him when he fired.

Other cases in this Circuit further illustrate *Abraham*'s ability to reach the facts of this case. For example, in *Eberhardinger v. City of York*, after a high-speed chase, the suspect's vehicle moved toward an officer on foot, but the parties disputed whether the officer remained in the vehicle's path when he fired or had moved safely to its side. 782 F. App'x at 182. Viewing the facts in the plaintiff's favor, the Third Circuit assumed the officer was out of the vehicle's path when he fired four shots at the slow-moving car as it passed and held that *Abraham* clearly established the unlawfulness of that conduct. *Id.* at 184–86. Other Third Circuit decisions have applied the same principle in varying factual circumstances. *See Jefferson v. Lias*, 21 F.4th 74, 79–82 (3d Cir. 2021) (explaining that *Abraham* clearly established that deadly force is unjustified where a fleeing driver poses no immediate threat to the officer or others); *Rush v. City of Philadelphia*, 78 F.4th 610, 621–22 (3d Cir. 2023) (reaffirming that this principle has been "beyond debate" in this Circuit since

*Abraham*). Taken together, these cases confirm that, crediting Plaintiff's version of events, the circumstances here fall comfortably within *Abraham*'s clearly established rule.[9]

Defendants rely on several cases to argue that vehicle-shooting incidents occupy a hazy area of Fourth Amendment law, rather than any "clearly established" principle that would be applicable to this case. (*See* Defs.' Br., ECF No. 133-1 at 18–26 (citing, *inter alia*, *Brosseau v. Haugen*, 543 U.S. 194 (2004); *Mullenix v. Luna,* 577 U.S. 7 (2015); *Thompson v. Howard*, 679 F. App'x 177 (3d Cir. 2017); *Reyes-Marcelino v. Nutland*, No. 16-6774, 2022 WL 17250562 (D.N.J. Nov. 28, 2022)); Defs.' Supp. Br., ECF No. 155 at 12–16 (citing primarily *Servais v. Caccia*, No. 23-2565, 2025 WL 1378747 (3d Cir. May 13, 2025))). Those cases, to the extent they pre-date June 2018, do not entitle Clements to qualified immunity on this record. *Brosseau* and *Mullenix* involved materially different circumstances in which officers confronted actively fleeing suspects who posed ongoing dangers to officers or the public. *See Brosseau*, 543 U.S. at 200 (describing the suspect as "a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight"); *Mullenix*, 577 U.S. at 13 ("In this case, [the officer] confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road."). *Thompson* likewise involved dangerous, chaotic flight through a residential area after the driver had already demonstrated reckless disregard for others. *See* 679 F. App'x at 181 ("[W]e only address whether it would be clear to a reasonable officer at the time of the incident that shooting at a person fleeing in a vehicle,

[9] The Court is mindful that the *Eberhardinger*, *Jefferson*, and *Rush* opinions post-date the shooting and therefore do not themselves define the clearly established right at issue. However, they are instructive in that they explain and apply the rule already clearly established by *Abraham* and confirm that courts have repeatedly relied on *Abraham* when evaluating materially similar Fourth Amendment claims.

with the gas pedal pressed 'all the way to the floor,' after striking an occupied police vehicle was an excessive use of force."). And the *Reyes-Marcelino* and *Servais* opinions post-date June 2018 but are, in any event, also distinguishable. *See Reyes-Marcelino*, 2022 WL 17250562 at *1, 5 (finding officer entitled to qualified immunity for nine shots fired where he stood "two feet in front of the vehicle," the driver "reversed into a tight parking space toward a guardrail," and the officer fired "in anticipation that the vehicle might drive forward and be used as a weapon against him"); *Servais*, 2025 WL 1378747 at *1, 3 (noting a suspect associated with the decedent was wanted for armed robbery and the decedent "turned to drive towards" the officer prior to the shots being fired).

Those cases relied on by Defendants stand for the general proposition that an officer may use deadly force where a vehicle poses an imminent threat of death or serious bodily injury. But as is made clear by the Supreme Court, clearly established law is not to be defined "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). And for this case, *Abraham* provides an apt and rather precise comparator such that the "violative nature of [Clements'] particular conduct [was] clearly established" at the time of the shooting. *Id.* At bottom, "the dispute in this case is about the facts, not the law. The doctrine of qualified immunity is therefore inapposite." *Lamont*, 637 F.3d at 185.

Accordingly, if a jury credits Plaintiff's version of the events, Clements had fair warning that he could not use deadly force against Anderson under the circumstances then present.

***

The Court is mindful that the Fourth Amendment inquiry must account for the exigencies of the moment and may not be judged with the benefit of hindsight, particularly where, as here, the critical events unfolded in a matter of seconds. Even so, genuine disputes of material fact preclude summary judgment in Clements' favor on Count I—namely, whether the Nissan was

accelerating toward Clements in a manner that posed an immediate threat of serious physical harm, as Defendants contend, or was already turning to pass or move away from him, as Plaintiff's reconstruction and bullet-trajectory evidence suggests. Those disputes must be resolved by a jury.

Therefore, although Defendants are entitled to summary judgment on the Section 1983 conspiracy claim in Count II, genuine disputes of material fact preclude summary judgment on the underlying constitutional violation and Clements is not entitled to qualified immunity as to the individual Section 1983 claim against him in Count I. Accordingly, the Motion is denied as to Count I and granted as to Count II.

**B. Municipal Liability Claim (Count III)**

Count III asserts a Section 1983 claim against the Township.[10] Municipalities and other government bodies are amenable to suit under Section 1983 for constitutional rights violations, and may be liable only when the government entity, under color of some official policy or custom, causes an employee to violate another's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978) (quotations omitted).

In this case, Plaintiff advances both a policy or custom claim and a failure-to-train claim pursuant to *Monell*. (*See* Am. Compl., ECF No. 29 at ¶¶ 34–45; Pl.'s Br., ECF No. 138 at 34–47). Although there is a "close relationship" between the two, "the avenues remain distinct." *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019). The Court therefore addresses each in turn. Ultimately, the Township is entitled to summary judgment on Count III entirely, whatever the theory.

[10] This claim is also brought against Hanstein, the Township's Chief of Police. However, *Monell* claims cannot be asserted against individual defendants, even in their official capacity. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (finding that *Monell* liability occurs when "the municipality *itself* causes the constitutional violation at issue." (emphasis in original)); *Tatum v. Phila. Hous. Auth.*, No. 10-7577, 2011 WL 2118961, at *3 (E.D. Pa. May 26, 2011) ("Plaintiff cannot assert a *Monell* claim against [a government employee] in his official capacity."). Count III therefore fails as alleged against Hanstein.

1. Policy or Custom Theory

Plaintiff advances this claim based on DPD's alleged custom of failing to meaningfully investigate and track complaints of excessive force, all ostensibly in an effort to "protect [DPD] Officers from having their [use of force] decisions subjected to meaningful review." (Pl.'s Br., ECF No. 138 at 45). On the investigative side, Plaintiff claims that DPD failed to internally investigate use-of-force incidents once the GCPO decided not to bring criminal charges against an officer arising out of an alleged instance of excessive force. (*See id.* at 34–37). On the tracking side, Plaintiff contends DPD has a custom of misusing its early-warning Guardian system for identifying officers with multiple complaints or DPD Internal Affairs investigations such that the system was effectively useless. (*See id.* at 42–47).

To prevail on a policy or custom claim, the plaintiff must "identify the challenged policy [or custom], attribute it to the [municipality] itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984). "Customs," on which Plaintiff relies in this case, are implicit practices that are "so widespread as to have the force of law," *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997), and may be established by evidence of knowledge and acquiescence, *Fletcher v. O'Donnell,* 867 F.2d 791, 793–94 (3d Cir. 1989).

*Beck v. City of Pittsburgh* is the leading case in the Third Circuit concerning Section 1983 claims based on a custom of failing to investigate and/or track excessive force complaints. There the court reversed entry of judgment as a matter of law for a municipality where the plaintiff produced evidence that a municipal policymaker knew of, and acquiesced in, a custom of tolerating excessive force. 89 F.3d 966, 974–76 (3d Cir. 1996). Critical to that holding was the specificity of the record in which the plaintiff introduced "actual written civilian complaints of similar

nature . . . containing specific information pertaining to the use of excessive force" by the same officer, including "five complaints of excessive force in less than five years." *Id.* at 969, 973. Because those complaints arose in a "narrow period of time and were of similar nature" to the plaintiff's allegations, they permitted a reasonable jury to infer that the police chief "knew, or should have known," of the officer's "propensity for violence when making arrests." *Id.* at 973–74. So, while *Beck* acknowledged that complaint procedures must have "some teeth," *id.* at 974, its holding rested on a record of detailed, similar, officer-specific complaints, not generalized or unexplained statistics.

Since *Beck*, district courts in this circuit have grappled with the issue of what type and quantum of evidence a plaintiff must adduce in support of a *Monell* claim to survive summary judgment. For instance, statistical evidence alone, "isolated and without further context," generally "may not justify a finding that a municipal policy or custom authorizes or condones the unconstitutional acts of police officers." *Merman v. City of Camden*, 824 F. Supp. 2d 581, 591 (D.N.J. 2010) (citing *Strauss v. City of Chicago*, 760 F.2d 765, 768–69 (7th Cir. 1985)). Thus, for a plaintiff to show municipal acquiescence and causation based principally on statistics regarding the frequency of excessive force complaints and the rate at which those complaints are sustained, they must show why those prior incidents were wrongly decided and "how the misconduct in those cases is similar to that involved in the present action." *Franks v. Cape May County*, No. 07-6005, 2010 WL 3614193, at *12 (D.N.J. Sept. 8, 2010) (quotations omitted); *see Beck*, 89 F.3d at 975; *Garcia v. City of Newark*, No. 08-1725, 2011 WL 689616, at *3–5 (D.N.J. Feb. 16, 2011) (denying defendant municipality's summary judgment motion where plaintiff presented evidence that the six individual defendants together accounted for more than fifty-five complaints for excessive force and false arrest in the eleven years prior to the incidents at issue in that case).

Here, Plaintiff has adduced no evidence from which a reasonable jury could find that the Township knew of, and acquiesced in, a custom of tolerating excessive force, and that such acquiescence led to the force used against Anderson. As to the GCPO-declination theory, Plaintiff relies less on statistics than on evidence concerning how DPD handled the Anderson shooting itself. That evidence includes testimony that DPD Internal Affairs did not interview Bittner because the GCPO "handled everything," that Clements suffered no employment consequences because the GCPO "reviewed it and said it was good," and that neither officer completed a Use of Force Report despite DPD policy requiring one because the GCPO allegedly instructed that their statements would suffice. (Pl.'s Br., ECF No. 138 at 36 (citing Pl.'s Ex. B at 136:18–25, 156:21–157:3; Pl.'s Ex. E at 190:22–192:3)). But this evidence, while certainly not a model investigation pursuant to established procedures, shows only how DPD handled this particular shooting. It does not identify prior comparable incidents in which DPD treated a GCPO declination as a substitute for administrative review, nor does it show a pattern of failures sufficient to establish a municipal custom. Accordingly, these facts cannot support Plaintiff's *Monell* custom claim related to her declination theory. *See Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995) ("[One] case standing alone does not provide sufficient proof of a policy or custom to satisfy the dictates of § 1983."); *Blakey v. City of Pittsburgh Police*, No. 08-1332, 2010 WL 1254371, at *5 (W.D. Pa. Mar. 3, 2010) (recommending granting summary judgment to the city where "Plaintiff has presented nothing beyond his assertion that the investigation in this case was inadequate" and the "law requires multiple prior instances of a failure to investigate before a municipality is deemed to have developed a policy or custom"), *report and recommendation adopted*, 2010 WL 1177393 (W.D. Pa. Mar. 25, 2010).

Nor does Plaintiff cure that deficiency by citing to broader evidence concerning Clements' disciplinary history because such history is without the necessary context *Beck* and its progeny require. Plaintiff points to Clements' testimony that he had been investigated twenty to twenty-five times without anyone at DPD addressing the volume of complaints; that he learned the specific allegations in one prior excessive-force lawsuit naming him as a defendant only during his deposition; and that seven prior complaints against him generally involved excessive force. (Pl.'s Br., ECF No. 138 at 44–45 (citing Pl.'s Ex. E at 195:20–197:6, 287:1–288:11)); Defs.' SOMF, ECF No. 133-13 ¶ 39). That evidence is relevant to Plaintiff's theory, but it remains undeveloped and insufficient to preclude summary judgment. Without evidence showing what those complaints involved, how DPD investigated them, whether they were wrongly resolved, or how they resembled the Anderson shooting, a reasonable jury could not infer from the number of complaints alone—or from Clements' perhaps incomplete recollection of them—that DPD maintained a custom of tolerating excessive force. *See Petrillo v. City of Philadelphia*, No. 96-5911, 1997 WL 363844, at *3–5 (E.D. Pa. June 16, 1997) (holding that deposition testimony revealing complaints against named defendants and citation of civil rights cases against city were insufficient to create municipal liability). Put differently, the record contains no evidence permitting a factfinder to connect the dots and find a custom "of deliberate indifference toward the risks of police misconduct" that proximately caused Anderson's constitutional injuries. *Franks*, 2010 WL 3614193, at *11 (citing *Groman,* 47 F.3d at 637). To be sure, Plaintiff is not required to prove at summary judgment that every prior complaint against Clements was meritorious. But Plaintiff must present evidence from which a jury could assess the substance, timing, and similarity of the complaints or investigations to prior instances, as well as the adequacy of the resulting investigations and the basis for inferring that municipal inaction, rather than the mere existence of

prior complaints, caused the later use of force. The present record does not permit that inference without speculation.

The Guardian evidence is similarly insufficient. Clark, Plaintiff's police-practices expert, states that Clements had a history of complaints and that, "when the complaints regarding Sergeant Clements were entered into the Guardian System they were deliberately mislabeled as minor infractions and the actual facts indicative of actual serious misconduct and excessive use of force were omitted altogether." (Pl.'s Br., ECF No. 138 at 46–47 (citing Pl.'s Ex. K at 18, 24)). But that opinion suffers from the same defect: it lacks the necessary context. Without evidence showing what the underlying complaints involved, what information was entered into Guardian, what was omitted, or why any classification was improper, Clark's conclusion amounts to little more than a "vague assertion[] about the police department's failure to investigate other wrongdoings[.]" *Groman*, 47 F.3d at 637; *see Franks*, 2010 WL 3614193, at *12 (granting summary judgment where there was "no evidence that those complaints that were dismissed were improperly investigated and should have been sustained"); *Wakshul v. City of Philadelphia*, 998 F. Supp. 585, 592 (E.D. Pa. 1998) (granting summary judgment for the city where "the record provides no information as to the chronology, subjects, or contexts of [] investigations"). And even crediting Clark's assertion that complaints were "deliberately mislabeled," the absence of evidence explaining the alleged mislabeling, identifying a cognizable custom, or connecting that custom to the Anderson shooting renders any causal link "too tenuous" to withstand summary judgment. *Benhaim v. Borough of Highland Park*, 79 F. Supp. 3d 513, 523 (D.N.J. 2015) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990)).

Without adducing this material evidence to her *Monell* custom claim, no reasonable jury could find on that claim for Plaintiff. Defendants are accordingly entitled to judgment as a matter of law, and their Motion as to the *Monell* custom claim is granted.

2. Failure-to-Train Theory

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In this case, Plaintiff asserts that DPD's failure to train its officers on the use of human blockades to stop fleeing suspects, and more broadly a failure to train on foot pursuit training, constitutes an unconstitutional policy or custom that led to Anderson's injuries. The Court finds Defendants are also entitled to summary judgment on this theory.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* To establish liability in such cases, a plaintiff "must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." *Gilles v. Davis,* 427 F.3d 197, 207 n.7 (3d Cir. 2005) (internal quotations and citation omitted).

The critical inquiry is deliberate indifference. Ordinarily, a plaintiff must demonstrate a pattern of similar constitutional violations to establish that a municipality was deliberately indifferent to a need for additional training. Here, however, Plaintiff relies on the "single-incident" theory first recognized in *City of Canton v. Harris*. (*See* Pl.'s Br., ECF No. 138 at 38–42). *Canton* and its progeny have acknowledged that, in a narrow set of circumstances, "the need for more or different training is so obvious, and the inadequacy [of training] so likely to result in the violation

of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent," even absent a pattern of prior violations. 489 U.S. at 390 & n.10.

This case does not fall within that narrow category of viable single-incident failure-to-train claims. Plaintiff has not shown that the need for "human blockade" training, and even more broadly enhanced foot-pursuit training, was so obvious that the failure to provide it can be deemed constitutionally culpable. A municipality is not required to provide discrete training on every conceivable tactical variation that may arise within the broader universe of police encounters. *See Connick*, 563 U.S. at 68 ("[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability."). And here, Plaintiff offers no evidence that the need for "human blockade" training or foot pursuit training was so obvious that DPD officers required training in either form of tactical maneuvering.

Indeed, in suburban Deptford Township, it was not so predictable or obvious that a DPD officer engaged in a foot pursuit would use their body to block a vehicle that the absence of specific training on that scenario amounts to deliberate indifference. This is why Plaintiff's reliance on *Pelzer v. City of Philadelphia* is misplaced. *See* 656 F. Supp. 2d 517 (E.D. Pa. 2009). In *Pelzer*, the district court denied summary judgment on a failure-to-train claim premised on allegedly inadequate foot-pursuit training. *Id.* at 537. The record there permitted a finding that the City of Philadelphia's leadership "may have had reason to know its current patrol training was inadequate." *Id.* In reaching that conclusion, the court relied principally on an internal investigation report indicating that the existing program provided "virtually no training in foot pursuits," despite evidence that officers in the field often employed pursuit tactics that "violat[ed] basic safety principles." *Id.* The court also emphasized that the need for such training was especially apparent

in Philadelphia, where foot pursuits were likely a recurring feature of police work and where the urban environment presented predictable tactical challenges. *Id.* at 538.

The same cannot be said here. Unlike the record in *Pelzer*, Plaintiff has not identified evidence that this particular tactical scenario or some closely analogous foot-pursuit encounters recurred with sufficient frequency to place DPD policymakers on notice that existing training was constitutionally deficient. Nor has she produced evidence of prior similar uses of an officer's body as a barrier, prior injuries, prior complaints, or a policymaker's awareness that officers lacked guidance on this tactic. The possibility that more tailored training would have been helpful does not establish deliberate indifference.

Further, Deptford Township is not comparable to Philadelphia in either size or policing context. Nor does the obvious need for enhanced foot-pursuit training identified in *Pelzer* meaningfully illuminate any obvious need for the highly specific form of "human blockade" training Plaintiff thinks necessary. In short, it is not "so obvious" that the Township's failure to provide foot-pursuit or human-blockade training "can reasonably be attributed to a deliberate indifference." *Woloszyn*, 396 F.3d at 325 (quoting *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1029–30 (3d Cir. 1991)).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's failure-to-train theory alleged within Count III. [11]

***

In sum, there is no evidence from which a reasonable jury could find in Plaintiff's favor on her *Monell* municipal liability claim. Summary judgment is therefore granted for Defendants on Count III.

**C. State Law Claims (Counts IV through IX)**

Counts IV through IX assert various state law claims against Clements.[12] In one form or another, the ability of these claims to withstand summary judgment rises and falls with the Court's

---

[11] Plaintiff also suggests, though only in passing, that DPD unconstitutionally trained its officers "to escalate rather than deescalate the use of force." (Pl.'s Br., ECF No. 138 at 42 (emphasis omitted)). The Court is not persuaded that this theory supports *Monell* liability. First, Plaintiff cites no authority suggesting that a policy permitting officers to escalate force during an encounter is facially unconstitutional. Indeed, case law elsewhere seems to reject that premise. *See Batiste v. City of Beaumont*, 421 F. Supp. 2d 1000, 1007 (E.D. Tex. 2006) (finding "nothing unconstitutional" about a force-escalation policy). Second, in the Court's view, this theory sounds more naturally as a policy or custom claim than a failure-to-train claim. Plaintiff, however, does not develop the argument in those terms or provide any meaningful analysis supporting it. The Court therefore declines to address this theory further.

[12] The parties' briefing on the state law claims leaves much to be desired and requires the Court to discern, largely on its own, which claims remain pending and against which Defendants. Count V is illustrative. The Court's prior order on the motion to dismiss, read in isolation, appears to dismiss Count V in its entirety. (Order, ECF No. 39 ("Plaintiffs' claims of Assault and Battery in Count V are dismissed with prejudice")). The motion to dismiss briefing and the Court's accompanying Opinion, however, suggest a narrower dismissal. (*See* ECF No. 33 at 4 (acknowledging that "Plaintiffs have conceded to dismissal of . . . the assault and battery claim against Deptford Township" alone); Op., ECF No. 38 at 11 (dismissing with prejudice "the claims of Assault and Battery as to Deptford Township")). For purposes of the present Motion, against the backdrop of this uncertainty, the Court considers only the state law claims against Clements to remain active. And to the extent any state law claims remain pending against any other Defendant, the Court finds that Plaintiff has conceded summary judgment on those claims by failing to respond substantively to Defendants' motion—which ostensibly seeks summary judgment on all claims against all remaining Defendants—other than by offering that "the state law causes of action are dependent upon this Court's resolution of the federal claims" against Clements. (ECF No. 138 at 47 (cleaned up)).

analysis of the Section 1983 claim against Clements, as well as resolution of the factual disputes relevant to that claim. Accordingly, the Motion will be denied as to Counts IV through IX.

1. NJCRA Claim (Count IV)

Count IV asserts a claim under the NJCRA, N.J.S.A. §§ 10:6-1 to -2, based on the alleged violation of Anderson's rights under the United States and New Jersey Constitutions.

Clements is not entitled to summary judgment on this claim. Courts in this District have repeatedly recognized that NJCRA claims are analyzed "through the lens" of Section 1983 and are construed nearly identically to their federal counterparts. *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44 (D.N.J. 2011); *see also Chapman v. New Jersey*, No. 08-4130, 2009 WL 2634888, at *3 (D.N.J. Aug. 25, 2009); *Armstrong v. Sherman*, No. 09-716, 2010 WL 2483911, at *5 (D.N.J. June 4, 2010). And New Jersey's constitutional search-and-seizure protections are interpreted analogously to the Fourth Amendment. *Hedges v. Musco*, 204 F.3d 109, 121 n.12 (3d Cir. 2000). Accordingly, the same genuine disputes of material fact that preclude summary judgment on Plaintiff's Section 1983 excessive-force claim also preclude summary judgment on Plaintiff's NJCRA claim. Defendants' Motion is therefore denied as to Count IV.

2. Tort, Wrongful Death, and Survivorship Claims (Counts V through IX)

The remaining state law claims proceed as follows: Count V for common-law assault and battery; Count VI for negligence; Count VII for gross negligence; Count VIII for wrongful death; and Count IX for survivorship. (Am. Compl., ECF No. 29 at ¶¶ 51–69). Defendants contend that the New Jersey Tort Claims Act ("NJTCA") immunizes Clements from liability on each of these claims. (Defs.' Br., ECF No. 133-1 at 43–48). The Court disagrees.

The NJTCA immunizes public entities and public employees from liability for "any injury resulting from or caused by a law enforcement officer's pursuit of a person." N.J.S.A. § 59:5-2(c).

It also immunizes a public employee who "acts in good faith in the execution or enforcement of any law." N.J.S.A. § 59:3-3. Those immunities, however, do not apply where the employee's conduct "constituted a crime, actual fraud, actual malice or willful misconduct." N.J.S.A. § 59:3-14(a). Willful misconduct in particular "is not immutably defined" and "takes its meaning from the context and purpose of its use." *Fielder v. Stonack*, 661 A.2d 231, 242 (N.J. 1995). New Jersey courts have explained, however, that it is "more than an absence of good faith" and approximates as a "reckless disregard for safety." *Alston v. City of Camden*, 773 A.2d 693, 702 (N.J. 2001) (citations and quotations omitted).

Here again, the same factual disputes that preclude summary judgment on objective reasonableness in the Fourth Amendment context also preclude summary judgment on willful misconduct, such that Clements is not entitled to NJTCA immunity as a matter of law. Plaintiff brings material evidence to support her contention that Clements knowingly escalated a shoplifting apprehension by placing himself in front of the Nissan, disregarded policy limits on shooting at moving vehicles, and continued firing after the vehicle's trajectory allegedly showed it was no longer bearing down on him. Those facts, if accepted by a jury, could support a finding of reckless disregard for a known and serious risk above and beyond objective unreasonableness. Summary judgment is therefore denied as to the state law tort, wrongful death, and survivorship claims against Clements.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for summary judgment. (ECF No. 133). The Motion is denied as to Count I, granted as to Counts II and III, and, as to Counts IV through IX, denied as to Clements and granted as to all other Defendants.

Date: August 21, 2026

**CHRISTINE P. O'HEARN**
**United States District Judge**